

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-18-00077-CV

IN THE INTEREST OF R.M., C.S.,
I.S., AND T.M., CHILDREN

----------

### FROM THE 231ST DISTRICT COURT OF TARRANT COUNTY
### TRIAL COURT NO. 231-458944-09

----------

## MEMORANDUM OPINION[1]

----------

In a single issue, Appellant Mother argues that the evidence was insufficient to support the trial court's determination that termination of her parental rights to three of her five children was in their best interest. We disagree and affirm the trial court's order.

## Background

Mother has five children. The youngest, J.M.,[2] was an infant at the time of trial and was not part of these termination proceedings.[3] R.M., the oldest, was

---

[1]*See* Tex. R. App. P. 47.4.

14 years old, and R.M.'s alleged father was serving a 40-year prison sentence in Louisiana at the time trial began. C.S. and I.S. were ten and nine years old, respectively, and their father passed away before these proceedings were initiated. T.M. was two years old when trial began. The four oldest children—R.M., C.S., I.S., and T.M.—were all the subject of the termination proceedings in the trial court.

The final trial was conducted piecemeal through four hearings spread out over a span of six months starting September 1, 2017, and ending February 15, 2018, and at the conclusion of the proceedings, the trial court terminated Mother's parental rights to the three youngest children—C.S., I.S., and T.M. R.M. was placed in the custody of a relative, Mother's cousin, who was appointed R.M.'s permanent managing conservator, and Mother's rights were not terminated as to R.M. Mother's appeal is limited to the trial court's decision to terminate her parental rights and does not complain of the trial court's decision as it relates to R.M.

---

[2]In accordance with rule 9.8, we refer to children and family members by aliases. Tex. R. App. P. 9.8(b) & cmt.

[3]J.M. was born during the Child Protective Services (CPS) investigation, and the petition filed by the Department of Family and Protective Services (Department) concerning J.M. was severed from the instant case by agreement of the parties.

2

**I.    Mother has a history of abusive relationships, mental illness, and drug use.**

**A.  Mother's involvement in abusive relationships**

Mother's relationships with her children's fathers have been marred by domestic violence.  With two of those fathers out of the picture at the time of trial—one deceased, one incarcerated—the evidence presented to the trial court focused on Mother's relationship with Clark, T.M.'s father.  Evidence of the violence was provided by police officers, investigators, caseworkers, and Mother herself.

On April 4, 2015, Fort Worth Police Department (FWPD) Officer Alexander Marti responded to a report of domestic violence at Mother's apartment.  Officer Marti testified that a child had called 911 after an argument between Mother and Clark had escalated "to the point where the female was strangled while . . . [Clark] was holding a baby, and . . . he also assaulted one of the children."  More specifically, Officer Marti testified,

> Towards the end of the incident, [Mother] was trying to get the kids out of the apartment.  [Clark] was not letting them go.  He grabbed one of the children by the arm, yanked the child by the arm to the point where the kid said, it felt like his bones were popping out.  And then Mr. [Clark] locked them in the apartment refusing to let them leave . . . .

Officer Marti arrested Clark for family-violence assault by strangulation, endangering a child, injury to a child, and unlawful restraint.

During the subsequent investigation by CPS, Mother admitted that the children had witnessed other incidents of domestic abuse, including an incident

3

when she and Clark were yelling and screaming at each other and Clark pulled Mother's hair so hard that it was ripped from her scalp. According to CPS investigator Viviana Martinez, Mother recounted a time when Clark started a "physical argument" and took her phone. Mother also purportedly told CPS caseworker Crystal Roman of another instance when "he either pushed her or threw her to the ground, and [T.M.] was in close proximity when it happened."

CPS concluded that there was reason to believe that neglectful supervision and physical abuse had taken place but that removal was not immediately necessary and referred Mother to Family Based Safety Services (FBSS) in June 2015. Roman worked with Mother for the next nine months until March 2016.

## B. Mother's mental health struggles

Roman testified to her concerns about Mother's mental health. According to Roman, Mother made statements during their initial visit about having "really bad anxiety and having episodes of falling out or blacking out or not being able to get out of bed" and "that she did not like to make left . . . turns because the devil was waiting for her." Based on her observations, Roman referred Mother to counseling with Merit Family Services, where Kimberly Dunn-Lipscomb counseled Mother.

Lipscomb began working with Mother in October 2015 to address the concerns about Mother's anxiety and experiences of domestic abuse. Her initial observations of Mother were similar to those of Roman and she testified that during their initial visit, Mother "would lower her voice and whisper when she

4

would tell [Lipscomb] certain facts about her life, like someone was listening to [them]." Lipscomb also recalled how Mother would sometimes appear "jittery and nervous" during counseling sessions, would "rub[] her hands together" and fail to make appropriate eye contact, and how her speech was rushed and she sometimes stuttered. Lipscomb identified these as classic symptoms of anxiety. Mother admitted to Lipscomb that she had mental issues that needed to be addressed, and Lipscomb explained to the trial court that the core of Mother's anxiety stemmed from past trauma, including her own childhood abuse and her experiences during Hurricane Katrina.

MHMR records that were admitted into evidence at trial also showed a history of Mother's struggle with mental illness. These records indicated that Mother had suffered bouts of "significant depression" starting in 2011 with a self-described nervous breakdown. The records also described Mother's experience of childhood abuse, family history of mental illness including anxiety, and a past admission for psychiatric treatment in 2014, and indicated that medication had previously been prescribed for Mother. According to the records, three of Mother's children had attempted suicide. The records also revealed that Mother had sought assistance for depression in October 2016 after the children were removed from her care, at which time she was assessed as "psychotic with poor judgment." The records also included a recommendation from the October 2016 visit that Mother be placed in a "partial hospitalization program," and if one was not available, inpatient psychiatric hospitalization. Records from February 2017

indicated that Mother self-reported having bipolar disorder and "more frequent mood swings," that she was isolating herself from other people, that she had lost her motivation to do much more than go to counseling, and that some of her triggers were as basic as "crossing the street, new areas, walking up and down the stairs, heights, [and] elevators."

## C. Mother's drug use

Mother failed three drug tests during the termination proceedings. In October 2016, she tested positive for marijuana and cocaine. In January 2017 and again in August 2017, she tested positive for cocaine. Yet Mother only admitted to using marijuana in the past and claimed she had "no idea" why she had tested positive for cocaine multiple times. She also disclaimed any knowledge of Clark's drug use, including a 2015 conviction for possession of methamphetamine.

## II. Mother's initial improvement was short-lived and the children were removed in March 2016.

By the beginning of 2016, Mother appeared to be improving and in January 2016, Lipscomb discharged Mother from counseling because Lipscomb felt they had "address[ed] all the concerns with domestic violence." Roman closed the case in March 2016 because it appeared Clark was no longer living in the apartment and Mother reassured Roman that she and Clark were no longer in a relationship, "that she did not want to be with him, [and] that she would not allow him into the home."

Those assurances were quickly proven false. Mother did not follow through with her promises to Roman and she began seeing Clark again. On March 14, 2016, police were called when Clark took off from the apartment with T.M., who was one at the time, after an argument with Mother. Accounts differed as to what happened, but FWPD received reports that Clark had either placed T.M. on a brick wall or had tossed the child over a brick wall surrounding the apartment, had jumped over the wall, and then had picked up T.M. and run away from the apartment complex. FWPD was able to locate Clark and T.M. using a helicopter for an aerial search and by tracking Clark's cell phone location. In subsequent interviews, Mother blamed the children for starting the argument between her and Clark.

After this incident, the Department removed the children and filed a petition seeking to terminate Mother's parental rights to her four children and Clark's parental rights to T.M. Clark, who could not be located at the time of the final trial, did not participate in the proceedings. A service plan was put in place that required Mother to avoid committing any crimes; demonstrate financial stability; participate in a psychological evaluation and follow all resulting recommendations; participate in individual counseling until she was successfully discharged; take parenting and domestic violence classes; take all prescribed medications; participate in couple's counseling with Clark; and maintain stable and appropriate housing.

7

**III.     Mother failed to implement good parenting behaviors.**

CPS caseworker Jennifer Goodridge was assigned to the case.  At trial, Goodridge admitted that Mother had participated in some of the required services—she completed the parenting class and attended visitation, for example—but Goodridge also testified that Mother failed to make any progress in implementing the lessons learned through counseling and the classes into her everyday life.  Lipscomb, who restarted weekly counseling sessions with Mother in December 2016, expressed similar concerns.  In their opinions, Mother's failures to implement those lessons were manifested by her continued contact with Clark, the children's ongoing serious behavioral issues, and her unstable housing and employment.

**A.  Mother's continued relationship with Clark**

Particularly concerning to both Goodridge and Lipscomb was Mother's continued involvement with Clark.

Goodridge testified that Clark attempted to attend a supervised visitation held at a McDonald's in December 2016, something that she testified the court order did not authorize Clark to do.  According to Goodridge, the supervisor in attendance, who knew that Clark was not supposed to be there, asked him to leave, at which point Mother actively undermined the supervisor's instruction by taking T.M. to the bathroom, calling Clark on a cell phone and telling T.M. to say "hi" to Clark.

During the proceedings, Mother became pregnant with another child by Clark. That child, J.M., was removed from Mother's care in August 2017 because Mother tested positive for cocaine shortly after his birth.

Mother continued to be in contact with Clark after J.M.'s birth. FWPD Officer Allen Hostler testified that on November 16, 2017 he responded to Mother's apartment to investigate a report of domestic violence. According to Officer Hostler, Mother called the police and reported that Clark was "being rude, and she wanted him out of the house." Clark was not at the apartment by the time Officer Hostler arrived, but Officer Hostler recalled Mother informing him that Clark had property, including clothing, at her apartment and that she had "allowed him to stay on the balcony to sleep." Officer Hostler testified, "[Mother] said that she felt sorry for him, that she would let him stay over, and that he would take advantage of her."

### B. The children's behavioral problems

The Department also expressed concern about Mother's ability to handle certain behavioral problems exhibited by the children. According to Goodridge, I.S. was hospitalized for mental health concerns multiple times over the course of the proceedings, including four times in December 2017 and again in February 2018.

Goodridge testified, "The children have multiple behavioral problems . . . . There have been a few incidents during visits [in] which [Mother] became frustrated and was not able to manage [their] behaviors." Goodridge described

9

an incident close to the time of trial in which I.S., who was nine at the time, "became agitated during a visit and was acting up and was very agitated and angry and actually wound up running out of the visitation room and eventually ran out of the CPS building near the highway." Goodridge testified, "[Mother] was sitting on the couch during his tantrum and during his exiting the building just holding the baby."

She also described a second incident earlier in the case in which the oldest child, R.M., became agitated because "[Mother] had blamed [R.M.] for the children being in foster care." According to Goodridge, "[R.M.] got upset and threw a chair, and . . . actually had to be taken out of the visitation room to calm down." While Goodridge described these as the most serious incidents that had taken place during visitation, she also testified that Mother would generally "get frustrated during visits and prefer[red] that [the children] just sit in chairs or not interact with each other." Goodridge noted her observation of a closer bond between Mother and T.M. than between Mother and the other children, and she especially noticed the lack of a bond between Mother and R.M. In summary, Goodridge testified to her concerns of "[Mother]'s lack of bonding with the oldest child, her inability to manage their behaviors, and, additionally, when one of the children was sent to a psych[iatric] hospital last year, [Mother] handled that by using drugs."

Lipscomb also did not believe Mother had made progress in managing her children's behavioral problems and testified that "several of the children have

very different personalities, so they act out in different ways, and . . . [Mother] continue[d] to struggle with dealing with it in the moment." Lipscomb acknowledged that Mother had made progress by ceasing to engage in ineffective and abusive parenting techniques and by implementing some positive and effective ones, but she also cautioned that Mother had more work to do in learning how to engage and interact with the children appropriately. Lipscomb also testified that while Mother had made progress in recognizing the appropriate developmental levels of the children, Mother "continue[d] to struggle with understanding what their needs are individually, which causes her to become frustrated, which in turn makes the children act out."

Lipscomb expressed concern that the children would not be safe if they were returned to Mother. Lipscomb explained that out of over 20 goals that she and Mother had set, Mother had accomplished "maybe . . . four or five of them." By February 2018, Lipscomb had unsuccessfully discharged Mother from counseling.

### C. Mother's unstable housing and employment situations

Mother testified at trial that she had lost her housing benefits after the children were removed from her care. At the November 2017 trial date, she submitted a copy of a lease for an apartment that she planned to move into that cost more than $1,400 a month. But her ability to afford the apartment was called into question by evidence of her sparse employment history.

11

Mother was unemployed for approximately ten years, from 2007 through 2017. She worked at Applebee's for a month during the proceedings but was let go because, according to Mother, she "was not fast enough." She obtained another job at Albertson's and started it in November 2017.

## IV. The trial court terminated Mother's parental rights to C.S., I.S., and T.M.

### A. The Department's plans for the children

R.M. lived with Mother's cousin during the termination proceedings. Goodridge reported that the placement went well, and the Department requested that R.M. remain in Mother's cousin's care.

The Department sought termination of Mother's parental rights to the other three children, but Goodridge testified that the Department was hoping to place them with relatives. Two of Clark's relatives were prepared to take custody of T.M., and at the time of the final day of trial in February 2018, the Department had begun the process of evaluating their fitness for placement. The Department was also investigating a placement option with C.S. and I.S.'s paternal relatives in Louisiana at the time of trial. Goodridge did express some doubts about this placement in light of the children's "deteriorating" behavior.

### B. Mother's request

Mother requested that the trial court not terminate her parental rights but instead appoint the Department as the children's permanent managing

conservator and allow the Department to continue working to place the children with relatives.

### C. The trial court's order

The trial court found that termination of Mother's parental rights to C.S., I.S., and T.M. was in their best interest. It also found that Mother had:

- knowingly placed or allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being, *see* Tex. Fam. Code Ann. § 161.001(b)(1)(D) (West Supp. 2017);

- engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being, *see id.* § 161.001(b)(1)(E);

- executed an unrevoked or irrevocable affidavit of relinquishment of parental rights, *see id.* § 161.001(b)(1)(K);[4]

- constructively abandoned the children, *see id.* § 161.001(b)(1)(N); and

- failed to comply with the provisions of the court-ordered service plan, *see id.* § 161.001(b)(1)(O).

The trial court also terminated Clark's parental rights to T.M. He does not appeal.

## Discussion

Mother's appeal is limited to a single issue complaining of the sufficiency of the evidence to support the trial court's finding that termination of her parental rights to C.S., I.S., and T.M. was in her children's best interest.

---

[4]In our review of the record, we have not located any such affidavits. Regardless, Mother does not contest this finding on appeal or the other four statutory findings under subsection (b)(1), and we note that only one such finding is required to uphold a parental-rights termination order. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

**I.     Standard of Review**

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit.  Tex. Fam. Code Ann. § 161.206(b) (West Supp. 2017); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).  Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures."  *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)).  We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent.  *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 554–55; *Holick*, 685 S.W.2d at 20–21.  Termination decisions must be supported by clear and convincing evidence.  *See* Tex. Fam. Code Ann. § 161.001(b), § 161.206(a) (West 2014); *E.N.C.*, 384 S.W.3d at 802.  Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'"  *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also E.N.C.,* 384 S.W.3d at 802.  Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent-child relationship, the party seeking termination must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in family code section 161.001(b)(1) and that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b); *E.N.C.,* 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.—Fort Worth 2012, no pet.).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the Department proved the challenged ground for termination. *In re J.P.B.,* 180 S.W.3d 570, 573 (Tex. 2005).

We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.*

15

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses because that is within the factfinder's province. *Id.* And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.*

We are required to perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the trial court's judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative

16

of both the subsection (1) ground and best interest. *Id.* at 249; *C.H.*, 89 S.W.3d at 28. Nonexclusive factors that the trier of fact in a termination case may also use in determining the best interest of the child include

(A)    the desires of the child;

(B)    the emotional and physical needs of the child now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.,* 402 S.W.3d at 249 (stating that in reviewing a best interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may be inapplicable to some cases. *C.H.,* 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the

17

presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## II. Application

Mother's argument is premised on the fact that the Department did not seek to terminate her parental rights to R.M. In her view, the Department's request to terminate her rights to three of the children and not to R.M. was inconsistent and undermines the trial court's decision.

Mother's argument fails to view the plans for the children's placements in the context of the other evidence presented. Evidence about placement plans and plans for adoption are relevant to a determination about best interest. *C.H.*, 89 S.W.3d at 28. The Department did not seek termination of Mother's rights to R.M., who was 14 at the time of trial, because R.M. had already been successfully placed with Mother's cousin. The Department did not indicate whether the cousin was interested in adopting R.M. In contrast, the other three children were living with foster families. And while the Department was actively working to place them with family members, it had a broader goal of eventual adoption of the children.

Viewing the evidence as a whole and in the light most favorable to the trial court's decision, we do not view the trial court's determination that termination was in the best interest of C.S., I.S., and T.M. as unreasonable. The trial court was presented with evidence of the following:

18

- Mother's continued involvement in violent and abusive relationships and the children's observations of those relationships. *See In re E.M.*, 494 S.W.3d 209, 222 (Tex. App.—Waco 2015, pets. denied) ("Abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child."); *In re G.M.G.*, 444 S.W.3d 46, 59 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("Abusive or violent conduct can produce a home environment that endangers a child's well-being."). Despite the Department's attempts to aid Mother and her acknowledgement that her relationship with Clark was violent and detrimental to the children, Mother continued to see Clark and allow him in her home during the pendency of the termination proceedings.

- Mother's three positive tests for cocaine use during the termination proceedings. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied) ("Drug use and its effect on a parent's life and his ability to parent may establish an endangering course of conduct.").

- Mother's lack of progress in managing her mental health conditions. *See In re C.D.*, 664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ.) (acknowledging that although mental illness alone is not a ground for termination of parental rights, when a parent's mental illness allows her to engage in conduct that endangers the child's well-being, that conduct has bearing on the advisability of termination).

- Mother's unstable housing and employment situations. *See G.M.G.*, 444 S.W.3d at 60 ("A parent who lacks stability, income, and a home is unable to provide for a child's emotional and physical needs.") quoting *In re J.T.G.*, No. 14-10-00972-CV, 2012 WL 171012, at *17 (Tex. App.—Houston [14th Dist.] Jan. 19, 2012, pet. denied) (mem. op.)); *R.W.*, 129 S.W.3d at 739 ("As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child.").

- Mother's failure to implement sufficient positive parenting techniques and the children's serious behavioral needs, particularly I.S.'s own mental health conditions. *See In re S.B.*, 207 S.W.3d 877, 886 (Tex. App.—Fort Worth 2006, no pet.) (explaining that, in addition to the *Holley* factors, a parent's inability to provide adequate care for the child, lack of parenting skills, and poor judgment may also be considered when considering the child's best interest).

- Despite Mother's completion of some requirements of her service plan, her failure to progress in counseling and failure to implement the lessons learned through classes and counseling. *See In re W.E.C.,* 110 S.W.3d 231, 245 (Tex. App.—Fort Worth 2003, no pet.) (discussing a parent's failure to utilize offered programs in evaluating decision to terminate her parental rights).

Based on our thorough review of the record, we hold that the evidence was factually and legally sufficient to support the trial court's finding that termination of Mother's parental rights to C.S., I.S., and T.M. was in their best interest. We therefore overrule Mother's sole issue.

## Conclusion

Having overruled Mother's sole issue on appeal, we affirm the trial court's order.

/s/ Bonnie Sudderth

BONNIE SUDDERTH
CHIEF JUSTICE

PANEL:  SUDDERTH, C.J.; GABRIEL and KERR, JJ.

DELIVERED:  July 19, 2018